# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 8864 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **FINANCIAL RESOURCES UNLIMITED,** | ) | |
| **INC., SUPREME MAILING SERVICES,** | ) | |
| **INC., MARK E. SHELTON,** individually | ) | |
| and as an officer of the corporate defendants, | ) | |
| d/b/a L. Lewis & Associates, A. Joseph | ) | |
| & Associates, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On February 2, 2006, this Court entered a stipulated order that held Defendant, Mark E. Shelton, in civil contempt for violating the November 24, 2004 Stipulated Permanent Injunction and Final Judgment Order ("November 2004 Final Order") and held Defendant liable for consumer redress to compensate the injury caused by his conduct. Plaintiff, the Federal Trade Commission ("FTC"), then moved this Court for an order entering judgment for consumer redress in the amount of $1,493,793.69 against Defendant, Mark E. Shelton, and for an order modifying the Final Order in this matter. Defendant objected to the size of the proposed judgment and to the proposed modifications of the Final Order. This matter comes before this Court pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 72.1.

After conducting an evidentiary hearing on March 14, 2006, the Court has carefully considered the testimony of witnesses who appeared at the hearing, the exhibits introduced into

evidence, the written submissions of the parties and the arguments of counsel. The following are

the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure

52(a). To the extent certain findings of fact may be deemed to be conclusions of law, they shall

so be considered the Court's conclusions of law. Similarly, to the extent matters contained in the

conclusions of law may be deemed findings of fact, they shall also be considered the Court's

factual findings.


## I.     Findings of Fact

### A.     Claims of the Parties

1.      On February 2, 2006, the FTC and Defendant stipulated to the entry of the

Stipulated Order Holding Mark E. Shelton in Civil Contempt ("Stipulated Contempt Order"). In

the Stipulated Contempt Order, Defendant admitted to multiple violations of this Court's

November 2004 Final Order and conceded that (a) he is liable for consumer redress to

compensate the injury caused by his contumacious activities and (b) modification of the

November 2004 Final Order is appropriate. The FTC claims that Defendant engaged in a pattern

or practice of contemptuous conduct and is liable for consumer redress in the amount of

$1,493,793.69 (calculated using gross receipts of the entities Defendant allegedly controlled).

The FTC also seeks modification of the November 2004 Final Order pursuant to Federal Rule of

Civil Procedure 60(b).

2.      Defendant claims that he did not have control over any of the companies used to

violate this Court's November 2004 Final Order and only violated the Final Order on a few

isolated occasions when he assisted others in starting and running their companies. Because his

violations of the November 2004 Final Order were so insignificant, Defendant argues that his liability should be limited to the $117,452.82 that he received in exchange for his consulting services and any modifications to the November 2004 Final Order should be minimal. Defendant also argues that the FTC's proposed judgment of $1,493,793.69 for consumer redress is improperly computed, punitive in nature, and does not take Defendant's financial hardship into account.

### B.     The Parties

3.     Plaintiff FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC is charged, inter alia, with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC is authorized to initiate federal district court proceedings, enjoin violations of the FTC Act, and secure such equitable relief as may be appropriate in each case, including restitution for injured consumers. 15 U.S.C. § 53(b).

4.     Defendant Mark E. Shelton is an Illinois resident who owns residential property in Darien, Illinois. Defendant also owned residential property in Hinsdale, Illinois from December 2004 until he transferred the deed to the property into a land trust in February 2005.

### C.     The Relevant Court Orders and Procedural History

5.     On November 24, 2004, Defendant stipulated to the November 2004 Final Order, which included, among other things, the following restrictions:

## I. BAN ON SALE OF WORK-AT-HOME OPPORTUNITIES

IT IS THEREFORE ORDERED that Defendants are hereby permanently restrained and enjoined from engaging, participating, or assisting others in any manner or in any capacity whatsoever, whether directly or indirectly, in concert with others, or through any intermediary, third party, business entity, or device, in the marketing, advertising, promotion, offering for sale, or sale of work-at-home opportunities.

## II. PROHIBITIONS AGAINST MISREPRESENTATIONS

IT IS FURTHER ORDERED that Defendants . . . are hereby permanently restrained and enjoined from making, or assisting others in making, any express or implied representation or omission of material fact that is false or misleading, in any manner, to any consumer or entity, including but not limited to, any false or misleading statement:

- A. That consumers are likely to earn a substantial amount of money;
- B. Concerning the amount of earnings, income, sales volume, or profits that a consumer is likely to achieve;
- C. Concerning the amount of earnings, income, sales volume, or profits that consumers have achieved in the past;
- D. That Defendants will pay consumers for each envelope that they stuff and mail in any envelope stuffing, work-at-home opportunity;
- E. Concerning the length of time that it may or will take to recoup the purchase price or investment;
- F. That Defendants will reimburse consumers any expenses of purchasing or participating in Defendants' offered goods or services;
- G. Concerning the nature of any work-at-home opportunity, product, or service offered or sold; and
- H. Concerning any material term, condition, or limitation of the transaction or about the use of any offered good or service.

6. On November 15, 2005, the FTC filed its Motion for Order to Show Cause Why Defendant Mark E. Shelton Should Not Be Held in Contempt for Violating the Stipulated Permanent Injunction and Final Judgment Order. (Docket No. 28.) In its Motion to Show Cause, the FTC argued that Defendant was violating the November 2004 Final Order by

operating business entities engaged in work-at-home opportunities, namely Pure Home Air Profits Co. ("PHAP") and Wholesale Marketing Group ("WMG"). The FTC submitted evidence in support of this claim.[1]

7.     On February 2, 2006, Defendant stipulated and agreed that (1) he violated Sections I, II.A, II.B, II.D, and II.G of this Court's November 2004 Final Order, (2) through his violations of Sections I and II he is in civil contempt of this Court, and (3) he is liable for consumer redress to compensate the injury caused by his contumacious conduct. (Stipulated Contempt Order, p. 2.) This Court accepted Defendant's stipulations and set an evidentiary hearing for March 14, 2006, to determine the size of the judgment to be entered against Defendant and what modifications, if any, to make to the November 2004 Final Order.

8.     At the evidentiary hearing, the FTC presented evidence of harm to consumers caused by Defendant through PHAP and WMG, as well as Cardona Consulting, Inc. ("Cardona") (another business entity engaged in work-at-home opportunities that the FTC learned about only after filing its Motion to Show Cause), and moved the Court to enter a judgment for $1,493,793.69 against Defendant.[2]

## D.     The Business Entities Investigated

9.     Cardona was a business entity created by Louis Aviles. (Evid. Hearing: Aviles Testimony, Tr. at 17-18.) Aviles, who had worked with Defendant in late 2003 at Financial

---

[1] Evidence submitted in support of the FTC's Motion to Show Cause contains the notation "FTC Mot. Show Cause."

[2] Evidence submitted at the March 14, 2006 evidentiary hearing contains the notation "Evid. Hearing."

Resources Unlimited (one of Defendant's work-at-home businesses that was targeted by this Court's November 2004 Final Order and shut down by the FTC for violations of Section 5 of the FTC Act), was listed as the principal, president, and officer of Cardona. (Evid. Hearing: Aviles Testimony, Tr. at 15-17.)

10.     WMG is a single business entity that was created as a limited liability company in New York and was incorporated in Nevada. WMG, LLC was created in December 2004 and Aviles was listed as the "filer." WMG, LLC was organized under the laws of New York and its address was listed as 130 Church Street, #125, New York, NY 10007. WMG was also incorporated under the laws of Nevada, as WMG, Inc. Defendant's father, Carl Shelton, was initially listed as the officer and director of WMG, Inc., but, in June 2005, Robert Gomez amended the articles of incorporation and listed himself as director and sole officer of the company.[3] Gomez opened a WMG mail drop in Nevada, signing the contract on behalf of WMG and listing himself as a WMG officer. (FTC Mot. Show Cause: PX #1 (Lewis Decl., Nov. 9, 2005) ¶¶ 6-8 & Attachs. H-J.)

11.     PHAP was created by Jeremy T. Wilson in mid-2004. (Evid. Hearing: Aviles Testimony, Tr. at 21-22; FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 24.) At least two bank accounts list PHAP as a sole proprietorship in the name of "Jeremy Wilson d/b/a Pure Home Air Profits," with a mailing address at a UPS Store located in Hillside, Illinois. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 9, PX # 2 (Aron Decl.) ¶ 2.)

---

[3] Aviles testified that Defendant wanted more than one WMG to exist because, if one of them needed to be shut down, materials baring the WMG letter head could be used by the second company. (Evid. Hearing: Aviles Testimony, Tr. at 29-30.)

**E.     Cardona, PHAP and WMG Marketed, Advertised, Promoted and Sold Work-At-Home Opportunities.**

12.     Cardona, PHAP and WMG solicit consumers through classified advertisements seeking people to mail promotional advertising brochures from home. (Evid. Hearing: Aviles Testimony, Tr. at 18, 23-24, 26; FTC Mot. Show Cause: PX # 5 (Beyers Decl.) ¶ 2.)

13.     PHAP and WMG advertisements appear across the country and promise substantial steady earnings and that no selling will be involved. (FTC Mot. Show Cause: PX # 7 (Daniels Decl.) ¶¶ 2-4 & Attachs. A-B, PX # 9 (Ianello Decl.) ¶ 2 & Attach. A.) Cardona used advertising language that was nearly identical to the advertisements for WMG and PHAP and promised consumers substantial income for stuffing envelopes or mailing brochures. (Lewis Decl. (Feb. 23, 2006) ¶¶ 3-4 & Attachs. A, L.)

14.     The advertisements used by PHAP and WMG encourage potential customers to call the listed telephone numbers or visit the listed websites on the internet. (FTC Mot. Show Cause: PX # 7 (Daniels Decl.) ¶¶ 2-4 & Attachs. A-B, PX # 9 (Ianello Decl.) ¶ 2 & Attach. A.)

15.     A recorded message instructs consumers who call the listed telephone numbers to leave their name and address. (Evid. Hearing: PX # 2.) The recorded message also promises "a large weekly income [in exchange for] mailing sales materials from home," with no sales required. (Id.; FTC Mot. Show Cause: PX # 7 (Daniels Decl.) ¶ 3, PX # 9 (Ianello Decl.) ¶ 3.) PHAP and WMG send a package of introductory materials, including a welcome letter and order form, to consumers who leave their name and address. Like the recorded message, the welcome letters also promise substantial income with no sales required. (FTC Mot. Show Cause: PX # 9 (Ianello Decl.) ¶¶ 2-4, PX # 11 (Russo Decl.) ¶ 4 & Attach. B.)

16.     WMG operated the following websites: (1) www.asseenontvmailers.com;
(b) www.dundalkeagle.com; (3) www.boulderweekly.com. WMG's internet sites contained
introductory letters nearly identical to the PHAP and WMG introductory letters sent by mail that
promised consumers substantial income for mailing out brochures and stressed that no selling or
advertising was required. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶¶ 15-17
& Attachs. P-R.)

17.     PHAP advertised on the internet, including on the website
www.auroradailysun.com, which is operated by a local Aurora, Colorado newspaper. PHAP
promised consumers $600 per week for mailing postcards from home. (FTC Mot. Show Cause:
PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 18 & Attach. S.)

18.     WMG and PHAP work-at-home opportunities included stuffing envelopes with
gift certificates for merchandise, movie tickets, and vacation discounts, as well as mailing
advertising circulars, (FTC Mot. Show Cause: PX # 5 (Beyers Decl.) ¶ 5 & Attach. C, PX # 10
(Nelson Decl.) ¶ 5 & Attach. B), and brochures that advertise and solicit sales of products, such
as "Little Giant" Ladders. (FTC Mot. Show Cause: PX # 6 (Connelly Decl.) ¶¶ 4, 7, PX # 10
(Nelson Decl.) ¶ 8 & Attach. E.) Cardona work-at-home opportunities included, among other
things, providing consumers with information on air purifiers and penis enlargement devices,
which consumers would then sell from home. (Evid. Hearing: Aviles Testimony, Tr. at 18-19.)

19.     PHAP and WMG purported to allow consumers to choose the level of earnings
they would like to receive from the work-at-home opportunity by registering for one of four
earning groups. Each earning group had a different amount of mailers to be sent out and thus a

different earning potential and corresponding fee. (FTC Mot. Show Cause: PX # 9 (Ianello Decl.) ¶¶ 6-7 & Attach. D.)

20.     PHAP and WMG consumers paid anywhere between $60 and $180 to receive the work-at-home materials and were led to believe that they would earn substantial money and be paid a specific amount for each envelope or brochure they mailed. (FTC Mot. Show Cause: PX # 6 (Connelly Decl.) ¶¶ 4, 7-9, PX # 9 (Ianello Decl.) ¶¶ 6-7 & Attachs. C-D.)

21.     In many cases, after sending their money to PHAP or WMG, consumers never received the mailing supplies, (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 24, PX # 3 (Anger Decl.) ¶¶ 5-8), or received mailings with new instructions that reneged on earlier promises of guaranteed payments and informed consumers that they would only be paid a commission based on the number of orders for products generated by their mailings. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 24, PX # 5 (Beyers Decl.) ¶¶ 8-10, 15, 17, PX # 6 (Connelly Decl.) ¶¶ 6-7.)

22.     To enroll in Cardona work-at-home business opportunities consumers were required to pay between $60 and $180. After paying this fee, consumers learned for the first time that instead of being paid for each envelope mailed (as originally promised), they would only earn a commission if their mailings resulted in sales. (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) Attach. L.)

23.     PHAP and WMG consumers who decided against sending out the mailings or tried to contact the companies for a refund were not successful. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 24, PX # 6 (Connelly Decl.) ¶¶ 7-9, PX # 9 (Ianello Decl.) ¶ 10, PX # 10 (Nelson Decl.) ¶¶ 10-11.) Consumers who invested money in postage for the mailings

- 9 -

discovered that PHAP and WMG would not reimburse them for those expenses. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 24, PX # 7 (Daniels Decl.) ¶¶ 10-13 & Attach. G, PX # 8 (Deitrick Decl.) ¶ 15.) Consumers who attempted to mail out the brochures often found that a large potion of the mailers were returned as undeliverable because the addresses supplied by PHAP and WMG were wrong. (FTC Mot. Show Cause: PX # 5 (Beyers Decl.) ¶ 11.)

24.     The FTC is not aware of any consumers who have actually received any payment from PHAP or WMG. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 25.) And few consumers, if any, earned any money, much less substantial income, from Cardona work-at-home opportunities. (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) Attach. L.)

25.     Between the Better Business Bureau and the FTC consumer complaint database, there are approximately 150 registered complaints for PHAP and WMG. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 24.)

### F.     Cardona, PHAP and WMG Made Money Off the Work-At-Home Schemes.

26.     From November 2004 until June 2005, $243,260.85 (minus chargebacks) was deposited in Cardona's Charter One Bank account. (Evid. Hearing: PX # 11; Lewis Decl. (Feb. 23, 2006) ¶ 6 & Attach. B.) Most of the deposits were postal money orders and checks from consumers across the country. (Id.)

27. Wilson opened two business checking accounts under the name Jeremy T. Wilson d/b/a Pure Home Air Profits. (Evid. Hearing: PX # 5, 6; Lewis Decl. (Feb. 23, 2006) ¶ 7 & Attach. C.) From November 2004 until May 2005, $117,988.33 was deposited into PHAP's First Personal Bank account. (Evid. Hearing: PX # 12.) From April 2005 until September 2005, $110,767.00 was deposited into PHAP's Hinsbrook Bank and Trust account. (Id.) Most of the deposits into PHAP's accounts were postal money orders and checks from consumers across the country. (Evid. Hearing: PX # 5, 6; Lewis Decl. (Feb. 23, 2006) ¶ 7 & Attach. C.)

28. WMG business accounts exist at Bank of America, Washington Mutual Bank, and Oxford Bank & Trust. (Evid. Hearing: PX # 7, 8, 9, 21; Lewis Decl. (Feb. 23, 2006) ¶ 8 & Attachs. D-E.) From January 2005 until November 2005, $827,422.79 was deposited into WMG LLC's Bank of America account. (Id.) From April 2005 until November 2005, $206,063.35 was deposited into WMG, Inc.'s Washington Mutual Bank account. (Id.) From June 2005 until November 2005, $13,027.50 was deposited in WMG LLC's Oxford Bank and Trust account. (Id.) Most of these deposits were postal money orders and checks from consumers across the country. (Id.)

## G.    Defendant's Role At Cardona, PHAP and WMG

### 1.    Cardona, PHAP, and WMG operated out of the Justina Property.

29. Cardona, PHAP and WMG used the exact same staff, namely Defendant, Louis Aviles, Jeremy Wilson, Joseph Mizzi, Rosalie Johnson, Wendy Rivera, Bob Gomez, Ruben Lopez, and a man named "Larry," (Evid. Hearing: Aviles Testimony, Tr. at 18, 33-38), and

operated out of the exact same location, namely 828 Justina Street in Hinsdale, Illinois. (Evid. Hearing: Aviles Testimony, Tr. at 21; FTC Mot. Show Cause: PX # 2 (Aron Decl.) ¶¶ 2-8.)

30.     A U.S. Postal Inspector observed Defendant's actions at the Justina Street property on several occasions, including his interaction with the alleged principals of WMG and PHAP. Specifically, Postal Inspectors observing the Justina Property witnessed Gomez and another male load Priority Mail boxes and envelopes into a mini-van and drop them off at the post office. These boxes and envelopes were stamped with return addresses from either PHAP or WMG and were addressed to individuals across the country. Postal inspectors also witnessed Gomez drive from PHAP's private mailbox location to the Justina Property, and saw Defendant talk with Wilson, Aviles, and Gomez and go in and out of the Justina Property, and drive his car into the garage at the Justina Property. (FTC Mot. Show Cause: PX # 2 (Aron Decl.) ¶¶ 2-6.)

31.     Postal Inspectors recovered several consumer complaint letters addressed to WMG's New York address from the garbage at the Justina Property. (FTC Mot. Show Cause: PX # 2 (Aron Decl.) ¶ 8 & Attach. A, PX # 5 (Beyers Decl.) ¶ 15 & Attachs. I-H, PX # 13 (Simmons Decl.) ¶ 11.)

32.     During a November 2005 raid, FTC investigators found the following documents at the Justina Street Property: (1) an April 18, 2005 printing invoice listing WMG as a customer and Defendant as the WMG contact person, (Evid. Hearing: PX # 15); (2) an April 27, 2005 bill of lading for "Little Giant Ladder" Brochures that lists Defendant and the 828 Justina Street address as the destination, (Evid. Hearing: PX # 16); (3) several customer complaints regarding Cardona, (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) ¶ 14 & Attach. L); (4) multiple WMG bank statements and copies of WMG cashier's checks, (Suppl. FTC Mot.

Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) ¶ 12 & Attach. J); and (5) bank books from

three different WMG accounts. (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19,

2005) ¶ 18 & Attach. P.) During the raid, FTC investigators found other evidence that multiple

businesses were headquartered in the 828 Justina Street property, such as packaging and mailing

equipment and materials with various company letter head. (Evid. Hearing: Lewis Testimony,

Tr. at 45-50; Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) ¶ 20 &

Attach. R.)

### 2. Defendant owns and operates the Justina Property.

33.    Defendant owned the Justina property from December 2004 until February 2005.

(FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 10.) In February 2005, Defendant

transferred the deed to the Justina property into the name of Western Springs National Bank and

Trust, which acts as a trustee for land trust agreements. (Id.) According to Western Springs, a

land trust is executed for the sole purpose of holding title to real estate. (Id.) The person placing

it in the trust is the beneficiary of the trust and retains complete control over the management of

the trust property. (Id.) Under a land trust, the real identity of the owner is not disclosed to the

public. (Id.)

34.    Defendant paid telephone, cable and water bills for the Justina Property (Evid.

Hearing: PX # 17-19.)

35.     During the November 2005 raid on the Justina Property, investigators found pictures and personal items of Defendant and his family. (Evid. Hearing: PX # 17-19, Lewis Testimony, Tr. at 79.)

### H.     Defendant Not Only Housed the Cardona, PHAP, and WMG Operations, But Exercised Control Over Their Business Operations.

1.     Cardona

36.     Though he was not listed as an officer, director, or shareholder, Defendant maintained control over all Cardona business documents, handled all of Cardona's business dealings, including advertising and marketing, hired Cardona's employees, and paid Cardona's bills and employees, including Aviles's salary. (Evid. Hearing: Aviles Testimony, Tr. at 17-21.)

37.     Defendant asked Aviles to create Cardona and to maintain the business in Aviles's name. (Id.) Although Aviles was the principal, president, and officer of Cardona, he did not control Cardona. Rather, Aviles received daily work assignments from Defendant, such as picking up mail, typing up orders, and making deliveries. Occasionally, Defendant would have Aviles sign documents or contracts on behalf of Cardona. (Id.)

38.     Defendant handled all of Cardona's communications with the U.S. Postal Inspector. Defendant decided to dissolve Cardona when he received complaints from the U.S. Postal Inspector. (Id.)

- 14 -

2.     Pure Home Air Profits Co.

39.     In 2004, Defendant asked Wilson to create PHAP. Wilson was paid by Defendant to sign documents on behalf of PHAP but Wilson did no work for PHAP. (Evid. Hearing: Aviles Testimony, Tr. at 21-22.) Defendant signed PHAP checks when Wilson did not sign.[4] (Evid. Hearing: Aviles Testimony, Tr. at 24-25.)

40.     Though he was not listed as an officer, director, or shareholder, Defendant controlled all of PHAP's business operations, including advertising, marketing, payroll, and hiring. (Evid. Hearing: Aviles Testimony, Tr. at 21-25.) Additionally, Defendant bought CDs containing lists of potential customers to whom PHAP mailed work-at-home solicitations, (Evid. Hearing: Aviles Testimony, Tr. at 24), and used printed ads and consumer mailings that were extremely similar to those used by Defendant in the underlying case (i.e., the case that culminated in the November 2004 Final Order). (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶ 24.)

41.     At PHAP, Aviles received daily work assignments from Defendant. Aviles's responsibilities with PHAP included running errands, packaging supplies, typing up orders, listening to company voicemail, and depositing checks. (Evid. Hearing: Aviles Testimony, Tr. at 21-25.)

42.     Defendant received numerous payments from PHAP. (Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) Attach. BB.)

---

[4] According to Aviles, Wilson only signed the first ten checks issued by PHAP. (Evid. Hearing: Aviles Testimony, Tr. at 25.)

43.     Defendant shut down PHAP in 2005 after a local district attorney began asking Wilson questions about the business. (Evid. Hearing: Aviles Testimony, Tr. at 24.)

### 3.     WMG

44.     Though he was not listed as an officer, director, or shareholder, Defendant controlled WMG's business operations, marketing and advertising, and payroll, while Aviles was responsible for running errands, depositing checks, typing up orders and sending out mailings. (Evid. Hearing: Aviles Testimony, Tr. at 26-31.)

45.     In November 2004, Aviles opened a mailbox for WMG at Postnet Business Centers, 130 Church Street, New York, NY 10007. WMG paid for the mailbox using two different credit cards: a Mastercard belonging to Aviles and an American Express card belonging to Defendant. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶¶ 3-5 & Attachs. E-G.)

46.     In December 2004, Defendant paid for and registered two websites through Jenntech, Inc. Jenntech, Inc. set up and hosted the website listed in WMG's ads—the same website that contained WMG's introductory letter and order form. Until mid-2005, Defendant was Jenntech, Inc.'s contact person at WMG. (FTC Mot. Show Cause: PX # 4 (Berger) ¶¶ 2-3; Suppl. FTC Mot. Show Cause: PX # 1 (Jennison Decl.) ¶¶ 1-3.)

47.     Defendant's wife is the subscriber for at least two of the WMG telephone numbers listed in WMG advertisements. (FTC Mot. Show Cause: PX # 1 (Lewis Decl., Nov. 9, 2005) ¶¶ 18-21 & Attachs. T-U.)

48.     Defendant, his wife, and his parents received numerous payments from WMG. (Evid. Hearing: PX # 10; Suppl. FTC Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) Attachs. AA, DD, EE.)[5]

### 4. Additional evidence of Defendant's involvement with, and control over, Cardona, PHAP and WMG.

49.     During the November 2005 raid on the Justina Property, FTC investigators seized the following documents from Defendant's briefcase: (1) the script of the recorded message on the WMG answering machine, (Evid. Hearing: PX # 3); (2) business check cards for WMG's Washington Mutual Bank account, (Evid. Hearing: PX # 4); (3) a letter from the U.S. Post Office's Law Department addressed to Aviles and dated October 3, 2005, setting out a settlement agreement under which Cardona would be shut down and Aviles would cease and desist from all similar business dealings,[6] (Evid. Hearing: PX # 13); (4) an unsigned piece of paper containing text for an ad promoting work-at-home opportunities and instructions for placing the ad in publications in Alabama, Arizona, California, Michigan, New Jersey, Oklahoma, Texas and Virginia, (Evid. Hearing: PX # 14); and (5) handwritten notes with the phone numbers and mailing address for WMG in Nevada, a letter to an advertising company from WMG, and advertising copy. (Suppl. Mot. Show Cause: PX # 2 (Lewis Decl., Dec. 19, 2005) ¶¶ 5-6 & Attachs. C-D.)

---

[5] Aviles also testified that Defendant transferred WMG funds to himself by forging Aviles's signature on WMG checks. (Evid. Hearing: Aviles Testimony, Tr. at 27-28.)

[6] In the settlement agreement with the U.S. Post Office, Aviles agrees to "refrain from making materially false representations . . . in the future under any name or names, or through any corporate or other device." (Lewis Decl. (Feb. 23, 2006) ¶ 5.)

## I.    Defendant's Deposition Testimony

50.    Defendant was deposed by FTC attorneys on December 13, 2005.  (Evid. Hearing:

PX # 1.)  In response to the following questions, Defendant invoked the Fifth Amendment of the

United States Constitution and refused to answer:

> Q.    And isn't it true that over that course of time Pure Home
> Air Profits was paying money to different companies on your
> behalf?
> A.    I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep. p. 44.)
> Q.    Pure Home Air Profits was paying credit card bills and car
> payments on your behalf, isn't that true?
> A.    I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep. p. 50.)
> Q.    Isn't it true that Wholesale Marketing Group has paid
> money to third parties on your behalf?
> A.    I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep. p. 51.)
> Q.    Isn't it true that you paid money to Jenntech to set up Web
> sites for your companies?
> A.    I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep. p. 60.)
> Q.    Isn't it true that you received money from Wholesale
> Marketing Group and Pure Home Air Profits because you
> controlled and directed the business?
> A.    I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep.
> p. 64.)
> Q.    And that you kept all the records for Wholesale Marketing
> Group and Pure Home Air Profits?
> A.    I plead the Fifth.  (Id.)
> Q.    Isn't it true that there are also other documents for other
> companies maintained at the Justina Street address including
> documents for Cardona Consulting?
> A.    I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep.
> p. 76.)
> Q.    Isn't it true that you coordinated all of those efforts in
> opening the [Wholesale Marketing Group] mailboxes?
> A.    I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep. p. 90-91.)
> Q.    Mr. Shelton, isn't it true that you assisted in setting up the
> operations of Pure Home Air Profits?
> A.    I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep. p. 92.)
> Q.    Isn't it true that you assisted in setting up the operations of
> Wholesale Marketing Group?
> A.    I plead the Fifth.  (Id.)

Q.    Mr. Shelton, let's talk about the Pure Home Air Profits and Wholesale Marketing Group operations. Isn't it true they both market and sell work at home opportunities?

A.    I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 96.)

Q.    And isn't it true that you directed or assisted in those [Pure Home Air Profits and Wholesale Marketing Group] operations?

A.    I plead the Fifth. (Id.)

Q.    In fact, the welcome letters sent to consumers for Pure Home Air Profits and Wholesale Marketing Group were the same except for some minor differences in earnings amounts, isn't that true?

A.    I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 106.)

Q.    Isn't it true that you directed or assisted in the creation of this welcome letter and attached form?

A.    I plead the Fifth. (Id.)

Q.    Isn't it true that you used your old [Financial Resources Unlimited] ads and mailers to formulate or help formulate the new ones for Wholesale Marketing Group and Pure Home Air Profits?

A.    I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 118-19.)

Q.    And these [Master Instruction Sheet] instructions, isn't it true that these instructions reneged on the earlier promises from the initial welcome letter?

A.    I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 120.)

Q.    Isn't it true that in these instructions, these new instructions, that both Wholesale Marketing Group and Pure Home Air Profits break their promise to pay a set amount, whether it was five, six or ten dollars for each circular that a consumer mails out?

A.    I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 121.)

Q.    Mr. Shelton, aside from Wholesale Marketing Group and Pure Home Air Profits, isn't it true that you have directed or assisted in the operations of other work-at-home businesses out of the 828 Justina Street address?

A.    I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 139.)

Q.    Isn't it true that you have directed or assisted in the operations of Cardona Consulting, Inc.?

A.    I plead the Fifth. (Id.)

Q.    Isn't it true that Cardona Consulting was pretty much the exact type of business that Wholesale Marketing Group and Pure Home Air Profits is?

A.    I plead the Fifth. (Evid. Hearing: PX # 1, Def.'s Dep. p. 139-40.)

Q.     And isn't it true that you earned money from the business of
Cardona Consulting, Inc.?
A.     I plead the Fifth.  (Evid. Hearing: PX # 1, Def.'s Dep. p. 140.)

## J.     Defendant's Financial Resources

51.     Although Defendant's brief includes a chart that purports to list Defendant's assets,
including bank accounts, automobiles, and real property, Defendant presents no evidence to
substantiate the chart.  (Def.'s Br. at 6-7.)

52.     Although Defendant claims that he and his wife have considerable debt and a
daughter with serious medical problems, Defendant presents no evidence in support of his
claims.  (Def.'s Br. at 7.)

## II.     Conclusions of Law

### A.     Jurisdiction

1.     This Court has jurisdiction over the subject matter of this case and over all parties
hereto.

2.     The FTC's complaint states a claim upon which relief may be granted against the
Defendant under Sections 5 and 13(b) of the FTC Act, 15 U.S.C. §§ 45 and 53(b).

3.     Venue is proper as to all parties in the Northern District of Illinois pursuant to 15
U.S.C. § 53(b) and 28 U.S.C. §1391(b) and (c).

4.     The parties stipulated that his Court shall retain jurisdiction over this matter for
purposes of construction and modification of their Stipulated Contempt Order and the
November 2004 Final Order.  (Stipulated Contempt Order, p. 1.)

## B. Defendant Is In Civil Contempt of This Court

### 1. Defendant is in civil contempt.

5. Defendant agreed and stipulated that (1) he violated Sections I, II.A, II.B, II.D, and II.G of this Court's November 2004 Final Order, (2) through his violations of Sections I and II he is in civil contempt of this Court, and (3) he is liable for consumer redress to compensate the injury caused by his contumacious conduct. (Stipulated Contempt Order, p. 2.)

6. Defendant's actions, as described above, establish that he knowingly violated Sections I, II.A, II.B, II.D, and II.G of this Court's November 2004 Final Order when he operated and controlled business entities engaging in work-at-home opportunities.

7. In light of Defendant's stipulations and actions, Defendant is in civil contempt of this Court.

8. Once the Court finds civil contempt, it may impose a fine to coerce Defendant into compliance with the Court's order and remedial sanctions to redress consumer injury. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-05 (1947); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1029, 1033 (N.D. Ind. 2001), *aff'd* 312 F.3d 259 (7th Cir. 2002). Furthermore, in a civil contempt action to compensate injured consumers, the Court may enter sanctions in an amount reflecting the complainants' actual loss. *United Mine Workers of Am.*, 330 U.S. at 304.

9. Section 13(b) of the FTC Act specifically provides for injunctive relief for consumers harmed by unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 53(b). Thus, in a contempt action for violations of an order in an underlying Section 13(b) fraud case, the Court has the equitable authority to order payment of consumer redress for injury

caused by the violation. *FTC v. Kuykendall*, 371 F.3d 745, 764 (10th Cir. 2004); *McGregor v. Chierico*, 206 F.3d 1378, 1387-88 (11th Cir. 2000); *FTC v. Febre*, 128 F.3d 530, 534-37 (7th Cir. 1997).

10.     If the FTC shows through clear and convincing evidence that Defendant was engaged in a pattern or practice of contemptuous conduct, the Court may use the Defendant's gross receipts as a starting point for assessing sanctions. *Kuykendall*, 371 F.3d at 764 (finding that Section 5 of the FTC Act does not require the FTC to prove individual consumer reliance in a case involving a pattern or practice of misleading consumers over an extended period of time).

### 2.     The FTC has established, by clear and convincing evidence, that Defendant violated the Court order.

11.     Defendant's stipulation to knowing violations of Sections I, II.A, II.B, II.D, and II.G of the November 2004 Final Order constitutes clear and convincing evidence that Defendant engaged in a pattern or practice of contemptuous conduct.

12.     Defendant's multiple violations of Sections I, II.A, II.B, II.D, and II.G of the November 2004 Final Order, as described in the Court's findings of fact above, constitute clear and convincing evidence that Defendant engaged in a pattern or practice of contemptuous conduct.

13.     An individual may be held liable under the FTC Act for corporate practices if the FTC first can prove the corporate practices were misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989) (internal citations omitted).  Once

corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them. *Id.* Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer. *Id.* The FTC must then demonstrate that the individual had some knowledge of the practices. *Id.*

14.     The facts set out above demonstrate that Cardona, PHAP and WMG violated the FTC Act and caused harm to consumers by engaging in unfair and deceptive acts or practices in or affecting commerce. *See* 15 U.S.C. § 45(a).

15.     Although he was not listed as a principal, director, or officer of Cardona, PHAP, or WMG, the evidence establishes that Defendant (1) participated directly in the practices and acts of those companies, (2) held himself out as a representative of those companies, (3) was authorized to conduct business with third party vendors on behalf of those companies, and (4) controlled, operated, promoted, and benefitted from multiple work-at-home businesses throughout the twelve months immediately following the entry of the November 2004 Final Order.

16.     Furthermore, in a civil contempt action, invoking the Fifth Amendment "invites an inference that the witness' testimony would be adverse to his interests." *Cent. States, SE & SW Areas Pension Fund. v. Wintz Props., Inc.*, 155 F.3d 868, 872 (7th Cir. 1998) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

17.     Based on Defendant's invocation of the Fifth Amendment in response to specific questions during his deposition, the Court infers that Defendant set up the business operations for Cardona, PHAP and WMG, received payments from PHAP and WMG, maintained records for

PHAP and WMG, operated PHAP and WMG from his Justina Street property, and was directly involved in the management of Cardona, PHAP and WMG.

18.    Defendant is personally liable for the practices of Cardona, PHAP and WMG and for the actual losses sustained by complainants in this case.


3.    Consumer redress for $1,493,793.69 is appropriate.

19.    The $1,493,793.69 in gross income recorded by Cardona, PHAP and WMG was generated by unfair or deceptive acts, in violation of the FTC Act and this Court's November 2004 Final Order, so $1,493,793.69 is the amount necessary to redress injuries caused to consumers by those entities. It follows that Defendant is liable for $1,493,793.69 for consumer redress.

20. Defendant notes that the Court should avoid punitive sanctions when finding civil contempt. *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001).

21.    Ordering payment of consumer redress for injury caused by Defendant's violations of this Court's Order does not constitute a punitive action. *Id.*

22.    Defendant notes that the Court may take Defendant's financial situation into account when awarding sanctions. *United Mine Workers of Am.*, 330 U.S. at 304.

23.    Defendant has presented no evidence of financial hardship and cannot be considered a legitimate candidate for leniency on those grounds.

### 4. Modification of the November 2004 Final Order is appropriate.

24.     The Court has the power to modify the terms of its injunctions in the event that changed circumstances require it. *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 249 (1968); *SEC v. Advance Growth Capital Corp.*, 539 F.2d 649, 651 (7th Cir. 1976). This power to modify in light of changed circumstances extends to the modification of consent decrees. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383-84 (1992); *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932).

25.     In light of Defendant's contemptuous behavior and direct violations of the November 2004 Final Order, the circumstances in this case have changed such that modification of the November 2004 consent decree as to Defendant is necessary.

26.     In light of the changed circumstances, the FTC's proposed Order Awarding Damages for Contempt and the FTC's proposed Modified Permanent Injunction and Final Judgment Order as to Mark E. Shelton are reasonable and appropriate and the Court enters them at this time.

## III.   Conclusion

For the reasons stated above, the FTC's proposed Order Awarding Damages for Contempt and the FTC's proposed Modified Permanent Injunction and Final Judgment Order as to Mark E.

Shelton are entered. It follows that judgment is entered against Defendant for $1,493,793.69 and this Court's November 2004 Final Order is modified.

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: April 25, 2006.

Copies have been mailed to:

VICTOR DeFRANCIS, Esq.
YAA APORI, Esq.
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Room NJ-2122
Washington D.C. 20580

KATHERINE L. HAENNICKE, Esq.
JAMES K. BORCIA, Esq.
Tressler, Soderstrom, Maloney & Priess
Sears Tower, 22nd Floor
233 South Wacker Drive
Chicago, IL 60606-6308

JOHN C. HALLERUD, Esq.
Federal Trade Commission
55 East Monroe Street
Suite 1860
Chicago, IL 60603

Attorneys for Plaintiff

Attorneys for Defendants